UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JESSE ALAN LACKEY,

         Plaintiff,

    v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,[1]

       Defendant.

Case No. 16-cv-03511-SI

**ORDER RE: CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 14, 20

      Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision by the Acting Commissioner of Social Security denying plaintiff's claim for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") by the administrative law judge ("ALJ"). The parties have filed cross-motions for summary judgment. Dkt. Nos. 14, 20. For the reasons stated below, the Court GRANTS plaintiff's motion, DENIES defendant's cross-motion, and REMANDS this case pursuant to sentence four of 42 U.S.C. § 42(g) for further proceedings consistent with this Order.

**BACKGROUND**

**I.    Administrative Proceedings**

      In May 2012, plaintiff Jesse Alan Lackey, Sr. filed concurrent applications for DIB and SSI under Titles II and XVI of the Social Security Act, respectively, alleging a disability onset date of May 1, 2009. Administrative Record ("AR") 206, 210. His applications were denied initially, *id.* at 140-44, and on reconsideration. *Id.* at 149-54. Plaintiff then requested a hearing

---

[1] Nancy A. Berryhill, Acting Commissioner of Social Security, is substituted for her predecessor, Carolyn W. Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

1   before an ALJ.  *Id.* at 155-56.  Before the hearing, plaintiff amended his alleged onset date of

2   disability to August 25, 2010.  *Id.* at 306.

3          On October 1, 2014, ALJ Richard Laverdure conducted a hearing at which plaintiff was

4   represented by counsel.  *Id.* at 21.  On December 31, 2014, ALJ Laverdure denied plaintiff's

5   applications, finding that plaintiff was not disabled under sections 216(i), 223(d), and

6   1614(a)(3)(A) of the Social Security Act.  *Id.* at 32.

7          ALJ Laverdure's decision became the Commissioner's final decision when the Appeals

8   Council denied review on April 25, 2016.  *Id.* at 1.  Plaintiff then commenced this action to seek

9   judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) on the grounds that ALJ Laverdure

10  erred in denying DIB and SSI.  Dkt. No. 1.  Upon stipulation by the parties, the Court granted the

11  Commissioner two extensions of time to file a cross-motion for summary judgment and opposition

12  to plaintiff's motion, which the Commissioner ultimately did.  Dkt. Nos. 17, 19, 20.  Plaintiff then

13  filed his reply brief.  Dkt. No. 21.

14

15  **II.    Medical History**

16         At the time of the October 1, 2014 hearing, plaintiff was a 51-year-old man who graduated

17  from El Cerrito High School.  AR 41, 64.  He served in the Marine Corps from 1982 until 1985,

18  when he was discharged.  AR 418.  Plaintiff began working as a skip tracer in 1989.  *Id.*  He

19  continued such work until 2009, when the collection agency he worked for went out of business.

20  *See id.* at 303, 449.

21         Plaintiff was diagnosed with HIV in 1995 and has been on medication since.  *Id.* at 408,

22  412.  The record further indicates that plaintiff may have been diagnosed with AIDS sometime

23  before 2007.  *Id.* at 338, 341.  In 2007, plaintiff was diagnosed with Bell's palsy on the left side of

24  his face.  *Id.* at 325.  He initially experienced difficulty speaking, which was resolved through the

25  use of a speech therapist.  *Id.* at 325, 330, 335, 341.  However, plaintiff has not fully recovered

26  from the Bell's palsy—his physicians note that he has "subjective asymmetry in hearing," "neuro

27  left sided facial droop," and "lacrimation of left eye."  *Id.* at 397, 462, 508.

28

Plaintiff discontinued his medical treatment in 2009 when he lost his job after thirteen years of employment. *Id.* at 409, 413. He was able to resume medical treatment in August 2010, but had been unable to take his medications for several months. *Id.* at 409. Since resuming treatment, plaintiff has reported 100% adherence to his HIV medications. *See, e.g.*, *id.* at 502, 551. Plaintiff's T cell ("CD4") count has varied over the years, *see, e.g.*, *id.* at 394 (CD4 at 377 in January 2011), 403 (in September 2010, most recent report indicated CD4 around 400), 419 (CD4 was 242 in October 2012), but appears to have stabilized more recently. *See, e.g.*, *id.* at 462 (in June 2013, indicating that most recent CD4 count was 387), 524 (CD4 at 374 as of October 2013), 564 (CD4 at 374 as of September 2014).

Other than HIV and Bell's palsy, plaintiff has been diagnosed with a variety of other medical issues, including hypertension, hyperlipidemia, benign prostatic hypertrophy, gastroesophageal reflux disease, and hypothyroidism. *See, e.g.*, *id.* at 528. More recently, plaintiff was diagnosed with Type II diabetes, *see, e.g.*, *id.* at 539, and depression. *See, e.g.*, *id.* at 551. In addition, plaintiff has consistently complained of fatigue and general malaise. *See, e.g.*, *id.* at 352 (August 2010), 506 (October 2012), 524 (October 2013), 547 (February 2014).

### III. Medical and Vocational Evidence

At the time of the hearing, plaintiff's file contained several medical opinions from treating and examining practitioners. The ALJ further heard testimony from Dr. Kweli Amusa, a non-examining physician serving as a medical expert, and Malcolm Brodzinsky, a vocational expert. *Id.* at 39.

#### a. Medical Evidence

##### i. Eugene McMillan, M.D.

On October 22, 2012, Dr. Eugene McMillan conducted a physical examination of plaintiff. *Id.* at 417-20, 443-44. His report notes that plaintiff has HIV, left facial weakness secondary to Bell's palsy, dyslipidemia, and hypertension. *Id.* at 420. The report also states that plaintiff smoked one pack of cigarettes a day, but did not mention or discuss any marijuana use. *See id.* at

418. Dr. McMillan noted "watering of the left eye" but indicated "[t]here would be no limitations with seeing, hearing or speaking." *Id.* at 420. He concluded that plaintiff would be able to occasionally lift and carry 50 pounds, and frequently lift and carry 25 pounds. *Id.* Dr. McMillan further found that plaintiff would be able to stand and walk for six hours during an eight-hour workday. *Id.*

### ii. Rose Lewis, M.D.

On June 17, 2013, Dr. Rose Lewis conducted a physical examination of plaintiff. *Id.* at 445-447. Under "Diagnoses," her report lists HIV positive, hypertension, benign prostatic hypertrophy, hypothyroidism, and status post left-sided Bell's palsy. *Id.* at 447. While the report indicated that Dr. Lewis examined plaintiff's eyes, there is no mention of left eye lacrimation. *See id.* She did report, however, that plaintiff smoked marijuana twice a day to address his sleeping and appetite issues. *Id.* at 445. After examining plaintiff's range of motion, Dr. Lewis concluded that he could lift and carry up to 50 pounds occasionally and 25 pounds frequently, and that he could stand and walk up to six hours. *Id.* at 447.

### iii. Deborah Royal, N.P.

On July 15, 2013, Nurse Practitioner Royal treated plaintiff and completed a Physician Statement. *Id.* at 460-61. In that document, Nurse Practitioner Royal stated that plaintiff has "difficulties with physical activities" and "fatigues very easily." *Id.* at 460. She also stated that plaintiff found it difficult to focus or concentrate, where it could take him all morning to get his day started. *Id.* She found that he could lift/carry ten pounds occasionally, and less than ten pounds frequently. *Id.* She further noted that plaintiff was capable of sitting for less than six hours and standing/walking for less than two hours. *Id.*

In September 2014, Nurse Practitioner Royal completed an HIV Medical Assessment form regarding plaintiff. AR 564. She notes that she began treating plaintiff in 2011. *Id.* at 566. In the past, she had contact with plaintiff every four to six months, but that at the time of the report, she was seeing him on a monthly basis. *Id.* at 564. The form lists plaintiff as having several

manifestations of HIV infections, including fatigue, depressed mood, diarrhea, and sweats. *Id.*
Nurse Practitioner Royal estimated that, on average, plaintiff would experience "bad days"
resulting in work absences one to two days per week. *Id.* at 565. She also noted that plaintiff has
"marked difficulties in completing tasks in a timely manner due to deficiencies in concentration,
persistence and pace." *Id.* She further marked fatigue as a "prominent factor" in plaintiff's HIV,
noting that his sleep at night is frequently interrupted and that he requires a nap twice a day. *Id.*
In her opinion, plaintiff would not be able to engage in sedentary work for eight hours a day, five
days a week. *Id.*

Nurse Practitioner Royal also completed a Residual Functioning Capacity Form for
plaintiff in September 2014. AR 569. She stated that plaintiff could stand for two to three hours,
and that he needed to lie down during the day. *Id.* at 569-570. She further noted that plaintiff
could walk two blocks without resting, and could lift and carry five to ten pounds repeatedly
during an eight-hour period. *Id.* at 570.

In that same month, Nurse Practitioner Royal authored a letter stating that she works at the
East Bay AIDS Center (EBAC), specializes in HIV/AIDS and other infectious diseases, and has
been plaintiff's primary care provider since 2011. *Id.* at 571. She noted that plaintiff is seen at
EBAC every three to six months, but sometimes more frequently. *Id.* She further stated that she
reviewed plaintiff's psychological evaluation by Dr. Ede Thomsen, discussed *infra*, and found the
evaluation consistent with her observations of plaintiff. *Id.* Because of plaintiff's symptoms,
"most notably his severe fatigue," Nurse Practitioner Royal stated that plaintiff is unable to sit
upright more than two to three hours per day, and requires at least two naps per day of thirty to
sixty minutes each. *Id.* She estimated that plaintiff's health problems would likely result in one to
two absences per week from work. *Id.*

### b. Psychiatric Evidence

#### i. John Maris, Ph.D.

On October 12, 2012, Dr. John Maris conducted a psychiatric evaluation of plaintiff. *Id.* at
412-16. Dr. Maris noted that plaintiff spent his time "look[ing] after his great aunt." *Id.* at 413.

However, plaintiff reported that he was "having great difficulty taking care of his aunt and his mother and his sister are also supposed to be helping but he does not feel like they pull their weight." *Id.* at 414. Dr. Maris's report also states that plaintiff smoked marijuana every day for his appetite and had done so for many years. *Id.* at 414. After conducting a mental status examination, Dr. Maris concluded that "[plaintiff]'s functional level appears to be adequate with no significant mental health impairment," and assigned plaintiff a Global Assessment of Functioning ("GAF") score of 62. *Id.* at 415. He also noted that plaintiff had the ability to complete a normal workday/workweek without interruptions from his psychiatric condition. *Id.* at 416.

### ii.   Ahmed El Sokkary, Ph.D.

On June 17, 2013, Dr. Ahmed El Sokkary conducted a psychiatric evaluation of plaintiff. *Id.* at 449-50. Dr. El Sokkary's report noted that plaintiff "currently lives with his Great Aunt in Oakland and spends the majority of time at home watching TV the entire day." *Id.* at 449. Dr. El Sokkary concluded that "[t]he overall clinical presentation is of an individual with symptoms of anxiety and depression" and assigned plaintiff a GAF of 56. *Id.* at 450. He further found that plaintiff would have some difficulty keeping a regular workday/workweek schedule without interruptions from his psychiatric symptoms. *Id.* Dr. Sokkary noted, however, that the evaluation "was limited in scope and based on a single, time-limited session." *Id.*

### iii.   Tony Sillemon, MSW/Psy.D.

On July 16, 2013, Dr. Tony Sillemon completed a Community Outreach Questionnaire. *Id.* at 452-54. Dr. Sillemon indicated that he had known plaintiff for four years and treated him once a month. *Id.* at 452. He further indicated that plaintiff "presented in a tired mood" and was "[f]atigued, disheveled, but clean." *Id.*

Dr. Sillemon attached a document titled Claimant Self Report/Case Manager Functional Capacity Report, which is almost entirely written and expressed in the first person. *Id.* at 454-59; *see, e.g.*, *id.* at 454 ("I require rest or nap(s)"). The report indicated that plaintiff required two

hours of rest twice or more per day and suffered from diarrhea four times a week. *Id.* at 454. The report further stated that plaintiff's night rest was interrupted on a daily basis by night sweats, fevers, diarrhea, sinusitis, and anxiety, nervousness, and depression. *Id.* at 455. The report explained that plaintiff could walk for fifteen minutes, could stand for less than one hour, and was able to sit for two hours; he was able to bend occasionally and lift less than ten pounds occasionally. *Id.* at 458-59. Finally, the report indicated that plaintiff suffered from fatigue, neuropathy, lymph infections, and medication side effects that may affect him in his daily functioning. *Id.* at 459. Plaintiff signed the document on July 16, 2013 under penalty of law that the statements made therein were true. *Id.* Dr. Sillemon also signed the document under penalty of law that plaintiff's limitations, as described in the document, were consistent with his observation of and contact with plaintiff. *Id.* He further stated that he had regular contact with plaintiff since July 2009 and indicated that "Patient is not fit for gainful employment." *Id.*

### iv. Ede Thomsen, Ph.D.

On August 22, 2014, Dr. Ede Thomsen completed a psychological evaluation of plaintiff, which lasted 2 hours and 15 minutes, and authored a psychological report. *Id.* at 552-63. Dr. Thomsen noted that plaintiff has hypertension, HIV, and Bell's palsy. *Id.* at 553. She stated that plaintiff's left eye drooped and was "excessively teary." *Id.* She also noted that plaintiff reported no use of illegal drugs and denied any substance abuse issues. *Id.* After administering a variety of procedures, Dr. Thomsen concluded that plaintiff suffered from Major Depressive Disorder and Anxiety Disorder, as well as some traits of a personality disorder that needed further investigation, all of which caused difficulties with his daily functioning. *Id.* at 554, 559.

### LEGAL STANDARD

## I. Standard of Review

The Social Security Act authorizes judicial review of final decisions made by the Commissioner. 42 U.S.C. § 405(g). Here, the decision of the ALJ stands as the final decision of the Commissioner because the Appeals Council declined review. 20 C.F.R. § 404.981. This

Court may enter a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing. 42 U.S.C. § 405(g).

Factual findings of the Commissioner are conclusive if supported by substantial evidence. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2001). The Court may set aside the Commissioner's final decision when that decision is based on legal error or where the findings of fact are not supported by substantial evidence in the record taken as a whole. *Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999). Substantial evidence is "more than a mere scintilla but less than a preponderance." *Id.* at 1098. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Molina v. Astrue*, 674 F.3d 1104, 1110 (2012) (internal quotations omitted). To determine whether substantial evidence exists, the Court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Commissioner's conclusion. *Tackett*, 180 F.3d at 1098. "Where evidence is susceptible to more than one rational interpretation," the ALJ's decision should be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion. *Harman v. Apfel*, 211 F.3d 1172, 1175-78 (9th Cir. 2000). When no useful purpose would be served by further administrative proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. *Id.* at 1179 ("the decision of whether to remand for further proceedings turns upon the likely utility of such proceedings"). But when there are outstanding issues that must be resolved before a determination of disability can be made, and it is not clear from the record the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated, remand is appropriate. *Id.*

## II.     The Five-Step Disability Inquiry

A claimant is "disabled" under the Social Security Act if: (1) the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than twelve months," and (2) the impairment is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A)-(B). The Social Security Administration regulations provide a five-step sequential evaluation process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520. The claimant has the burden of proof for steps one through four, and the Commissioner has the burden of proof for step five. *Tackett*, 180 F.3d at 1098. The five steps of the inquiry are:

> 1. Is claimant presently working in a substantially gainful activity? If so, then the claimant is not disabled within the meaning of the Social Security Act. If not, proceed to step two. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).
>
> 2. Is the claimant's impairment severe? If so, proceed to step three. If not, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).
>
> 3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1? If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).
>
> 4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).
>
> 5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001). The ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry. *Tackett*, 180 F.3d at 1098 n.3.

In between the third and fourth step, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4), (e). To determine the RFC, the ALJ considers the impact of the claimant's symptoms on his or her ability to meet the physical, mental, sensory, and other requirements of work. *Id.* § 404.1545(a)(4). The ALJ will evaluate all the claimant's symptoms and the extent to which these symptoms are consistent with evidence in the record. *Id.* § 404.1529(a). The evidence can include the claimant's own statements about his or her symptoms, but such statements must be adequately supported by the record in order to

United States District Court
Northern District of California

establish a disability. *Id.* In order to determine whether the claimant's statements are adequately supported, the ALJ must first determine whether the claimant has a medical impairment that could reasonably be expected to produce his or her symptoms, and then must evaluate the intensity and persistence of the claimant's symptoms. *Id.* When evaluating intensity and persistence, the ALJ must consider all of the available evidence, including the claimant's medical history, objective medical evidence, and statements about how the claimant's symptoms affect him or her. *Id.* The ALJ cannot reject statements about the intensity and persistence of symptoms solely because no objective medical evidence substantiates the statements. *Id.* § 404.1529(c)(2). The ALJ must also consider factors relevant to the claimant's symptoms, such as the claimant's daily activities, the claimant's medications and treatment, any other measures the claimant uses to alleviate symptoms, precipitating and aggravating factors, and any other factors relevant to the claimant's limited capacity for work due to his or her symptoms. *Id.* § 404.1529(c)(3)(i)-(vii). After determining the RFC, the ALJ proceeds to step four and five of the disability inquiry.

## ALJ'S DECISION

Plaintiff alleged that he had a disability based on "HIV, hypertension, AIDS, facial nerve damage resulting from Bell's Palsy, chronic diarrhea, depression, anxiety, personality disorder, chronic fatigue, insomnia and frequent urination at night." AR 26 (internal footnote omitted). In determining that plaintiff was not disabled within the meaning of the Social Security Act, the ALJ applied the five-step disability inquiry set forth by 20 C.F.R. § 404.1520(a). *Id.* at 21-32. At step one, the ALJ found plaintiff had not engaged in substantial gainful activity since August 25, 2010, the alleged onset date of disability. *Id.* at 21, 23. At step two, the ALJ determined that plaintiff had two severe impairments: human immunodeficiency virus (HIV) and depressive disorder, not otherwise specified (NOS). *Id.* at 23. However, the ALJ found the following impairments not severe: diabetes, hypertension, hypothyroidism, gastroesophageal reflux disease (GERD), Bell's palsy, benign prostatic hyperplasia (BPH), hyperlipidemia, and chronic diarrhea. *Id.* at 23-24. At step three, the ALJ found that plaintiff's impairments did not meet or equal the severity of any impairment in the Listing of Impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.

10

United States District Court
Northern District of California

*Id.* at 24-25. In particular, the ALJ considered whether the "paragraph B" or "paragraph C" criteria were satisfied. *Id.*

Before beginning step four, the ALJ concluded that plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b), except he could occasionally climb a ramp or stairs, balance, stoop, kneel, crouch, and crawl, and never climb ladders, ropes or scaffolds. *Id.* at 25-30. The ALJ also found that "[m]entally, [plaintiff could] perform non-public simple repetitive tasks." *Id.* at 25. The ALJ determined that although plaintiff's medically determinable impairments could be expected to cause some of the alleged symptoms, the objective medical evidence did not substantiate plaintiff's claims as to the intensity, persistence, or functionally limiting effects of these impairments. *Id.* In reaching this determination, the ALJ found plaintiff's statements to be uncorroborated and at times inconsistent. *Id.* at 29-30.

The ALJ also considered several medical evaluations. In regard to plaintiff's physical health, the ALJ accorded the greatest weight to non-examining medical expert Dr. Amusa's opinion because "Dr. Amusa had the most complete record." *Id.* at 29. As for plaintiff's mental health, the ALJ accorded the most weight to Dr. Sokkary's opinion based on his "examining relationship" with plaintiff. *Id.* at 30. The ALJ accorded "less weight" to Dr. Maris' opinion, and no weight to Dr. Sillemon's opinion. *Id.*

At step four, the ALJ determined that plaintiff was unable to perform any past relevant work in what the vocational expert classified as a professional researcher and skip tracer. *Id.* at 30-31. At step five, the ALJ considered whether jobs that plaintiff could perform existed in the national economy. The ALJ noted that plaintiff was a "younger individual" on the alleged onset date, and subsequently changed age category to "closely approaching advanced age."[2] *Id.* at 31. The ALJ also stated that plaintiff has at least a high school degree and is able to communicate in

---

[2] Plaintiff was born on December 18, 1962. The ALJ's decision states that plaintiff was 46 years old on the alleged onset date. This appears to be an error, as the ALJ lists the amended alleged onset date as August 25, 2010 and correctly noted during the hearing that plaintiff was 47 years old on the onset date. AR 43. This discrepancy, however, does not alter the determination of plaintiff's age categories. *See* 20 C.F.R. §§ 404.1563(c)-(d), 416.963(c)-(d) (defining "younger person" as under age 50, and "person closely approaching advanced age" as ages 50-54).

11

English.  *Id.*  In light of plaintiff's age, education, work experience, RFC and the Medical-Vocational Guidelines (20 C.F.R. Part 404, Subpart P, Appendix 2), the ALJ determined that jobs that plaintiff could perform exist in significant numbers in the national economy.  *Id.* at 31.  The ALJ noted that if a person has a RFC to perform the full range of light work, the Medical-Vocational Rules 202.21 and 202.14 would require a finding of not disabled.  *Id.*  The ALJ concluded that its finding of additional limitations to the RFC "have little or no effect on the occupational base of unskilled light work"; plaintiff was not disabled under this framework; and plaintiff's impairments were not sufficiently severe to require a vocational expert at step 5.  *Id.* Accordingly, the ALJ found plaintiff was not under a disability, as defined by the Social Security Act.  *Id.*

## DISCUSSION

Plaintiff claims that the ALJ erred in determining his eligibility for DBI and SSI.  Pl.'s Mot. at 1.  First, Plaintiff argues that the ALJ erred at step two by not considering Plaintiff's Bell's Palsy and resulting left eye lacrimation as a severe impairment.  Second, plaintiff contends that the ALJ's reasons for rejecting his testimony are not clear and convincing, or supported by substantial evidence.  Third, plaintiff asserts that the ALJ erred in evaluating the medical opinions of Dr. Tony Sillemon, Nurse Practitioner Deborah Royal, Dr. Ede Thomsen, and Dr. Kweli Amusa. Lastly, plaintiff argues that the ALJ erred at step five by not obtaining vocational expert testimony, and improperly relying on the medical-vocational guidelines and on an RFC unsupported by substantial evidence in the record.  Plaintiff asserts that the proper remedy for these errors is remand for an immediate award of benefits or, in the alternative, for further proceedings.  *Id.* at 23-24.  Defendant, on the other hand, contends that the ALJ's final decision is supported by substantial evidence and free of reversible error, and, therefore, asks the Court to affirm.  Def.'s Mot. at 18.

## I.    Severe Impairments

Plaintiff argues that the ALJ erred at step two by failing to find left eye lacrimation, secondary to Bell's palsy a severe limitation. Pl.'s Mot. at 6. At step two, an ALJ determines whether a plaintiff has a medically severe impairment or combination of impairments. This determination "is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), superseded by statute on other grounds by 20 C.F.R. § 404.1529(c)(3). The Social Security Rulings and Regulations discuss the severity determination in terms of what is "not severe." *Id.* An impairment, or combination of impairments, is not severe "if it does not significantly limit [plaintiff's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522; *see also* SSR 85-28. "Basic work activities" means "the abilities and aptitudes necessary to do most jobs," including: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work.'" *Smolen*, 80 F.3d at 1290.

Here, the ALJ agreed with Dr. Amusa, a non-examining medical expert, and found that plaintiff's Bell's palsy did not constitute a severe impairment at step two. AR 23-24, 45-46. The ALJ found that the "progress notes confirm left facial droop due to Bell's palsy but do not show any functional impairment related to the condition." *Id.* at 24. Later, in determining plaintiff's RFC, the ALJ noted that plaintiff "contended that Bell's palsy caused tearing in his eye but that eye drops improved his symptoms." *Id.* at 26. The ALJ also stated that "[p]hysical examinations showed the facial droop related to past Bell's palsy but findings were otherwise normal." *Id.*

The Court finds that the ALJ erred at step two. Substantial evidence does not support the ALJ's finding that "[p]hysical examinations showed the facial droop related to past Bell's palsy but findings were *otherwise normal*." *Id.* at 26 (emphasis added). Indeed, the second exhibit cited

by the ALJ in support of this statement lists "increased lacrimation" and states that "[w]hat really bothers [plaintiff] most is lacrimation of the left eye." AR 508. Also, although the medical examiner found no functional impairment related to Bell's palsy, *see* AR 45-46, the "opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). It does not appear that the medical examiner ever discussed lacrimation or its potential effects on plaintiff's ability to perform basic work activities. Moreover, evidence in the record frequently lists both lacrimation and Ptosis resulting from Bell's palsy.[3] Also, at the hearing, plaintiff testified that his eye drains "a couple of times a day," resulting in tears running down his face. AR 77. He noted that he used eye drops to try to make it better, but does not state whether the drops were effective. *Id.*

The Commissioner states that, even assuming plaintiff's testimony is true, "common sense dictates that tears 'a couple times a day' can easily be mitigated with tissues or, at most, a visit to the restroom and would not cause and functional limitations[.]" Def.'s Mot. at 3. Plaintiff, on the other hand, asserts that the left eye ptosis and lacrimation "would cause limitations, such as missed work days and difficulties with concentration, persistence, or pace." Pl.'s Reply at 2. However, the full effect of this impairment on plaintiff's ability to perform basic work activities is not evident from the record. On remand, the ALJ should determine the effect that lacrimation secondary to Bell's palsy has on plaintiff's ability to perform such activities. *See Smolen*, 80 F.3d at 1288 ("[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered . . . even when the claimant is represented by counsel.").

---

[3] AR 400 (October 2010 progress notes listing Ptsosis from Bell's palsy); AR 508 (NP Royal noting "increased lacrimation" and stating, "[w]hat really bothers [plaintiff] most is lacrimation of the left eye"); August 2012 AR 420 (noting left eye ptosis and "[t]here was watering of the left eye" in October 2012); AR 547-548 (February 2014 progress notes listing ptosis and lacrimation); AR 543 (lacrimation in April 2014); AR 568 ("[e]xcessive lacrimation vs tear overflow left eye related to Bells Palsy" in September 2014).

## II.    Plaintiff's Testimony

Plaintiff also contends that the ALJ improperly discounted his testimony.  Pl.'s Mot. at 17.
The Ninth Circuit has established a two-step analysis for determining the extent to which a
claimant's symptom must be credited:

> First, the ALJ must determine whether the claimant has presented
> objective medical evidence of an underlying impairment which
> could reasonably be expected to produce the pain or other symptoms
> alleged. In this analysis, the claimant is not required to show that her
> impairment could reasonably be expected to cause the severity of
> the symptom she has alleged; she need only show that it could
> reasonably have caused some degree of the symptom. Nor must a
> claimant produce objective medical evidence of the pain or fatigue
> itself, or the severity thereof.

> If the claimant satisfies the first step of this analysis, and there is no
> evidence of malingering, the ALJ can reject the claimant's
> testimony about the severity of her symptoms only by offering
> specific, clear and convincing reasons for doing so. This is not an
> easy requirement to meet: The clear and convincing standard is the
> most demanding required in Social Security cases.

*Trevizo v. Berryhill*, No. 15-16277, 2017 WL 4053751, *9 (9th Cir. 2017) (quoting *Garrison v.
Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014)).[4]

The ALJ "may find the claimant's allegations of severity to be not credible," but "must
specifically make findings which support this conclusion."  *Bunnell v. Sullivan*, 947 F.2d 341, 345

_____

[4] Just as the Ninth Circuit noted in *Trevizo*,

> At the time of the ALJ's decision, there was a Social Security Ruling ("SSR") that
> "clarif[ied] when the evaluation of symptoms, including pain, . . . requires a finding
> about the credibility of an individual's statements about pain or other symptom(s)
> and its functional effects; . . . explain[ed] the factors to be considered in assessing
> the credibility of the individual's statements in the disability determination or
> decision."  SSR 96-7p (1996).  In March 2016, that ruling was superseded to
> "eliminat[e] the use of the term 'credibility' from our sub-regulatory policy, as our
> regulations do not use this term" and to "clarify that subjective symptom evaluation
> is not an examination of an individual's character" but instead was meant to be
> consistent with "our regulatory language regarding symptom evaluation." SSR 16-
> 3p (2016). This ruling makes clear what our precedent already required: that
> assessments of an individual's testimony by an ALJ are designed to "evaluate the
> intensity and persistence of symptoms after [the ALJ] find[s] that the individual has
> a medically determinable impairment(s) that could reasonably be expected to
> produce those symptoms," and not to delve into wide-ranging scrutiny of the
> claimant's character and apparent truthfulness.

*Trevizo*, 2017 WL 4053751, *9 n.5.

(9th Cir. 1991). In other words, "[t]he ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen*, 80 F.3d at 1284. "These findings, properly supported by the record, must be sufficiently specific to allow a reviewing court to conclude that the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Bunnell*, 947 F.2d at 345-46 (internal quotation marks omitted). The ALJ may consider inconsistencies between a claimant's testimony and conduct, daily activities, work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

At the first step of the credibility test, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause some alleged symptoms[.]" AR 26; *see Trevizo*, 862 F.3d at 1000. The ALJ cited no evidence of malingering. Moving to the second step, the ALJ noted that plaintiff "alleged disability based on impairments/symptoms of HIV, hypertension, AIDS, facial nerve damage resulting from Bell's Palsy, chronic diarrhea, depression, anxiety, personality disorder, chronic fatigue, insomnia and frequent urination at night." *Id.* at 26. The ALJ also stated that plaintiff "indicated that he experiences disturbed sleep, sweating (for the past three weeks), fatigue and poor/worsening appetite," as well as "tearing in his eye" from Bell's palsy. *Id.* However, the ALJ listed several reasons for finding that plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely credible." AR 26.

First, the ALJ stated that he was not "persuaded that the claimant experiences as much fatigue as alleged," noting that his physical examinations have been "fairly benign." *Id.* at 29. The ALJ stated that treatment records "concerning the claimant's physical impairments reflect complaints of fatigue . . . , but physical examinations failed to illustrate any significant problems." *Id.* at 27. The ALJ also noted that Nurse Practitioner Royal advised plaintiff to exercise 30 minutes per day, five days a week. AR 30. However, both physical and psychological examinations consistently reflect plaintiff's complaints of fatigue, and Nurse Practitioner Royal listed fatigue as a manifestation of plaintiff's HIV. *Id.* at 564. Further, the record reflects that

United States District Court
Northern District of California

1  fatigue could also be a result of plaintiff's mental, rather than physical, impairment.  *See, e.g., id.*
2  at 46-47.

3      In addition, the ALJ stated that plaintiff made inconsistent statements in the record.  AR
4  30.  For instance, the ALJ found plaintiff's testimony "that his mother and sister primarily cared
5  for his aunt and that [his] role was merely to warm up prepared food in the evening," was
6  inconsistent with the October 2012 evaluation in which plaintiff "stated that his typical day
7  included looking after his great aunt (spending time, cooking, and cleaning)."  *Id.*  However, the
8  October 2012 evaluation does not state how much time plaintiff spent on such tasks, but instead
9  notes that plaintiff "is having great difficulty taking care of his aunt."  AR 413.  The Court does
10 not find that these statements are necessarily inconsistent.

11     As another example of inconsistency, the ALJ cited plaintiff's testimony with differing
12 levels of marijuana usage.  AR 30.  However, the Ninth Circuit has stated that "assessments of an
13 individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of
14 symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s)
15 that could reasonably be expected to produce those symptoms,' and not to delve into wide-ranging
16 scrutiny of the claimant's character and apparent truthfulness."  *Trevizo*, 2017 WL 4053751, *9
17 n.5.  Here, the ALJ did not make any finding that plaintiff's marijuana usage impacted the
18 intensity or persistence of his symptoms.  Rather, this reason improperly delves into scrutiny of
19 plaintiff's character.

20     Therefore, the Court finds that the ALJ failed to support his credibility determination with
21 clear and convincing reasons.  This error was not harmless, particularly in regard to plaintiff's
22 claims of fatigue, because the vocational expert testified that no jobs exist in the national economy
23 for an individual that requires two naps of 30 to 60 minutes a day.  AR 83.

24

25 **III.    Medical Opinions**

26     Plaintiff argues that the ALJ erred by improperly weighing the opinions of Dr. Tony
27 Sillemon, Nurse Practitioner Deborah Royal, Dr. Ede Thomsen, and Dr. Kweli Amusa. Courts
28 distinguish among the opinions of three types of physicians: (1) treating physicians who have an

established relationship with the claimant; (2) examining physicians who see the claimant, but do not treat him; and (3) non-examining physicians who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, the opinion of a treating physician should be given greater weight than that of an examining or non-examining physician. *Id.* Likewise, an examining physician's opinion is usually entitled to more weight than that of a physician who has not examined the claimant. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

"The medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Trevizo*, 2017 WL 4053751, at*7 (quoting 20 C.F.R. § 404.1527(c)(2)). "When a treating physician's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician." *Id.* "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

For the reasons that follow, the Court finds that the ALJ committed error by not sufficiently supporting the weight given to the medical opinions and RFC assessments of Dr. Sillemon, Dr. Thomsen, Dr. Amusa, and Nurse Practitioner Royal.

### A.    Dr. Tony Sillemon

Dr. Tony Sillemon conducted an assessment of plaintiff on July 15, 2013.  He estimated that plaintiff "would miss 20 days of work per month due to health related problems" and was "not fit for gainful employment."  AR 459.  The ALJ gave no weight to Dr. Sillemon's assessment "because it appears to be based solely on the claimant's self-reports."[5]  *Id.* at 30.  Indeed, Dr. Sillemon's conclusions are contained at the end of a document entitled "Claimant Self Report / Case Manager Functional Capacity Report."  *Id.* at 454.  However, Dr. Sillemon certified under penalty of perjury "that the patient's limitations as described above are consistent with [his] observation of and contact with this patient," and noted that he "had regular contact with" plaintiff since July 2009.  AR 459.  The Court agrees with plaintiff that Dr. Sillemon's opinion is not based only on plaintiff's self-reports.

Defendant correctly notes that "[a]n ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).  However, the Court finds that even if Dr. Sillemon's opinion is based "to a large extent" on plaintiff's self-reports, plaintiff's credibility was not properly discounted, as discussed above.

The ALJ also stated that the opinion was inconsistent with Dr. Sillemon's notes from December 2012 and February 2013 "that describe the claimant as being in a pleasant mood."  *Id.* However, "[o]ccasional symptom-free periods . . . are not inconsistent with disability," *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995).  That plaintiff was in a "pleasant mood" at some appointments is not a clear and convincing reason not to afford any weight to Dr. Sillemon's opinion regarding plaintiff's work abilities in light of his HIV and depression.

Lastly, the ALJ noted that Dr. Sillemon did not reference any psychological symptom or complaint in his own notes from December 2012 and February 2013.  *Id.*  However, the Ninth Circuit "do[es] not require that a medical condition be mentioned in every report to conclude that a physician's opinion is supported by the record."  *Orn v. Astrue*, 495 F.3d 625, 634 (9th Cir. 2007).

---

[5] The ALJ's decision refers to Tony Sillemon as "Mr." rather than "Dr."

Instead, when viewed in its entirety, the record references psychological symptoms and, as plaintiff notes, Dr. Sillemon would have had access to these records as part of the EBAC treatment team. *See id.*; *see also Benton v. Barnhart*, 331 F.3d 1030, 1039 (9th Cir. 2003); AR 571 (Nurse Practitioner Royal noting that plaintiff sees other practitioners at EBAC, including Dr. Sillemon).

### B.      Dr. Ede Thomsen

Plaintiff also asserts that the ALJ improperly discounted the testimony of Dr. Ede Thomsen. After evaluating plaintiff, Dr. Thomsen concluded that plaintiff has Major Depressive Disorder and Anxiety, evidences some traits of a personality disorder, and his mental illnesses are causing difficulties with his daily functioning. AR 559. She also assigned a GAF of 45. *Id.* The ALJ accorded "little weight to Dr. Thomsen's opinion, including her GAF assessment." *Id.* at 30.

First, the ALJ discounted Dr. Thomsen's opinion "because her opined limitations are not consistent with relatively benign mental status findings and testings at the evaluation." *Id.* Dr. Thomsen's evaluation reflected generally average results in the "Cognitive Functioning" portion of the report. *Id.* 554-556. However, in the "Emotional Functioning" section, Dr. Thomsen identified plaintiff as having "moderate" depression and anxiety, and "significant emotional distress," among other things. *Id.* at 556-559. She found that plaintiff's difficulty with attention/concentration was "the result of his depression and anxiety," which "interferes with his ability to make decisions, resolve problems, and effectively manage his daily affairs." *Id.* 559. She further found plaintiff to be "vulnerable to decompensation if demands are placed upon him," making "his ability to be successful at a job site limited." *Id.* Lastly, Dr. Thomsen found that plaintiff had marked difficulties with maintaining attention and concentration for two hour segments; responding appropriately to changes in a routine work setting and dealing with normal work stressors; and completing a normal workday and workweek without interruptions from psychologically based symptoms. *Id.* 563.

"[A]s a lay person, an ALJ is simply not qualified to interpret raw medical data in functional terms." *Padilla v. Astrue*, 541 F. Supp. 2d 1102, 1106 (C.D. Cal. 2008). However, an ALJ may properly discount the statements of an examining physician where the physician's

findings were "so extreme as to be implausible," were "not supported by any findings," and there was "no indication in the record what the basis for these restrictions might be." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001). Dr. Thomsen's findings are not so extreme or unsupported. Indeed, Dr. Sokkary, to whom the ALJ afford the most weight, also found that plaintiff would have some difficulty maintaining a regular workweek schedule. Also, Nurse Practitioner Royal reviewed and agreed with Dr. Thomsen's assessment. AR 571.

The ALJ additionally found Dr. Thomsen's opinions to be "inconsistent with the mental status findings of Dr. Maris and Dr. El Sokkary." AR 30. "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198. Dr. Maris, however, found no mental disorder and the ALJ discounted Dr. Maris' opinion because "there does appear to be a severe psychological component." AR 30. The Court finds that it is not appropriate to discount a physician's testimony because it is inconsistent with the finding of another physician, when the ALJ has afforded little weight to the other physician's opinion. Further, Dr. El Sokkary's opinion does not appear inconsistent with Dr. Thomsen's opinion. As noted above, both found that plaintiff would have some difficulty maintaining a normal work schedule. Also, although Dr. Thomsen assigned a lower GAF score, her assessment was done in August 2014 compared with Dr. El Sokkary's assessment in June 2013. Therefore, it is equally plausible that Dr. Thomsen's opinion evidences a progression of plaintiff's mental impairment, rather than an inconsistency.

Lastly, the ALJ found Dr. Thomsen's opinion to be inconsistent with "the lack of psychological complaints in the progress notes, and the claimant's failure to seek any mental health treatment." AR 30. However, as the Ninth Circuit has noted, "it is common knowledge that depression is one of the most underreported illnesses in the country because those afflicted often do not recognize that their condition reflects a potentially serious mental illness." *Nguyen v. Charter*, 100 F.3d 1462, 1465 (9th Cir. 1996). "Thus, the fact that claimant may be one of millions of people who did not seek treatment for a mental disorder until late in the day is not a

substantial basis on which to conclude that [a physician's] assessment of claimant's condition is inaccurate." *Id.*

### C.    Dr. Kweli Amusa

Dr. Kweli Amusa reviewed the record and testified as a medical expert.  AR 28.  Dr. Amusa opined that plaintiff could "lift and carry weight at the sedentary exertional level, stand or walk 2 to 4 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday." AR 28.  In determining plaintiff's physical abilities, the ALJ accorded the "greatest weight to Dr. Amusa's opinion," noting that she had "the most complete record" and that her opinion was "relatively consistent with the treatment record." AR 29.  At the same time, and in contrast to Dr. Amusa, the ALJ found "that a limitation to a range of light exertional activity [ie, a more strenuous level than Dr. Amusa had found] more appropriate because [Dr. Amusa] remarked multiple times that the limitation to sedentary exertional activity was premised on complaints of fatigue." *Id.*  However, as noted above, the ALJ failed to give a clear and convincing reason for plaintiff's credibility determination, including the ALJ's finding that he was not "persuaded that the claimant experiences as much fatigue as alleged." *Id.* at 29.  Because the ALJ improperly discounted plaintiff's complaints of fatigue, the ALJ also improperly discounted Dr. Amusa's finding that plaintiff should be limited to the sedentary exertional level based on complaints of fatigue.

### D.    Nurse Practitioner Deborah Royal

Plaintiff next argues that the ALJ improperly discounted the testimony of nurse practitioner Deborah Royal.  "Nurse practitioners are considered 'other sources,'" rather than an "acceptable medical source." *Dale v. Colvin*, 823 F.3d 941, 943 (9th Cir. 2016) (citing 20 C.F.R. § 404.1513(a) & (d)(1)).  "The ALJ may discount testimony from these 'other sources' if the ALJ 'gives reasons germane to each witness for doing so.'" *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (quoting *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010)).  Such germane reasons may include a finding that the testimony conflicts with the witness' own

earlier assessment or with the opinion of other medical specialists, or a finding that the witness was biased. *Dale*, 823 F.3d at 944-45.

Since 2011, Nurse Practitioner Royal has served as plaintiff's primary care provider at the East Bay AIDS Center ("EBAC"), where plaintiff is seen every three to six months and at times, more frequently. AR 571. She opined that plaintiff would not be able to engage in sedentary work for eight hours a day, five days a week, noting that fatigue was a "prominent factor" in plaintiff's HIV. AR 565. In regards to her opinion, the ALJ stated:

> While Ms. Royal is not an acceptable medical source, I have considered her opinions as evidence of the claimant's impairments and functional capacity. I am not persuaded by her opinion because it is at odds with the physical examinations showing little to no abnormalities. Moreover, in May 2014, Ms. Royal advised the claimant to exercise 30 minutes per day, five days per week as a means of improving fatigue (and likely other symptoms).

AR 29-30.

The ALJ did not provide any citations supporting his assertion that other physical examinations show little to no abnormalities. The Court, therefore, finds that Nurse Practitioner Royal's asserted inconsistency with other opinions is not a germane reason. Although the Commissioner provides several citations to the record in her brief, there is no indication that the ALJ relied on these citations. Moreover, as plaintiff points out, many of the Commissioner's citations do list physical abnormalities. *See, e.g.,* AR 502 (noting a low CD4 count at 250); AR 508 (diarrhea and lacrimation). Also, Nurse Practitioner Royal's exercise recommendation—listed as a "therapeutic lifestyle change" to address plaintiff's diabetes—was not inconsistent with her other opinions finding that plaintiff could stand for two to three hours at a time, could walk two blocks without resting, and could lift/carry five to ten pounds repeatedly. AR 540, 569-570.

In sum, the ALJ failed to provide proper reasons for discounting the opinions of Dr. Sillemon, Dr. Thomsen, Dr. Amusa, and Nurse Practitioner Royal.

## IV. RFC Determination

Lastly, Plaintiff claims that the ALJ erred in determining plaintiff's RFC, improperly weighing the medical examiner's opinion and discounting plaintiff's claimed symptoms. Pl.'s

United States District Court
Northern District of California

Mot. at 19-20.  As discussed above, the Court agrees that the ALJ improperly weighed the medical opinions and failed to give a clear and convincing reason for discounting plaintiff's testimony. Consequently, the Court need not reach plaintiff's additional argument that the ALJ erred at step five when determining what jobs exist in the national economy that plaintiff could perform in light of the ALJ's RFC determination.

## V.  Remedy upon Remand

The remaining question is whether to remand for further administrative proceedings or for the immediate payment of benefits under the credit-as-true doctrine.  The Ninth Circuit has reaffirmed the validity of the doctrine.  *See Garrison*, 759 F.3d at 999 (describing the credit-as-true doctrine as "settled").  Under the doctrine, a court has the discretion to remand for payment of benefits where (1) the record has been fully developed, and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide sufficient reasons for rejecting the medical or subjective evidence; and (3) the ALJ would be required to find the claimant disabled on remand if the improperly rejected evidence were credited as true.  *Id.* at 1020.  Even where each of these conditions is met, the court retains the discretion to remand for further proceedings "when the record as a whole creates serious doubt over whether the claimant is, in fact, disabled[.]"  *Id.* at 1021.

Here, the Court finds that the record as a whole continues to raise doubt over whether plaintiff is disabled.  *See Burrell v. Colvin*, 775 F.3d 1133, 1141-42 (9th Cir. 2014).  As directed by the Ninth Circuit, the Court will "leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record."  *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).  Accordingly, the Court will remand plaintiff's claim for further proceedings.  On remand, the ALJ should reconsider whether plaintiff's Bell's Palsy and resulting lacrimation constitutes a severe impairment at step two.  The ALJ should also reevaluate the RFC finding in light of the Court's reversal regarding the above medical opinions and the credibility of plaintiff's statements.  From there, the ALJ should reevaluate step five of the disability inquiry, in light of any change in the RFC finding.

24

**CONCLUSION**

For the foregoing reasons, the Court REVERSES the decision of the Commissioner and REMANDS this case pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Order.

**IT IS SO ORDERED**.

Dated:   September 21, 2017

_____

SUSAN ILLSTON
United States District Judge